NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0579n.06
Filed: July 8, 2005

Nos. 04-1304, 04-1428

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| NORTON HEALTHCARE, INC., d/b/a NORTON AUDUBON HOSPITAL, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | ON PETITION FOR REVIEW AND CROSS-APPLICATION FOR |
| NATIONAL LABOR RELATIONS BOARD, | ) ) ) | ENFORCEMENT OF AN ORDER OF THE NATIONAL LABOR RELATIONS |
| Respondent. | ) ) ) | BOARD |

Before: CLAY and GIBBONS, Circuit Judges, and STAFFORD, District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge**. The Nurses Professional Organization, United

Nurses of America, American Federation of State, County and Municipal Employees, AFL-CIO

("the Union" or "NPO") filed charges with the National Labor Relations Board ("NLRB" or

"Board") against Norton Healthcare, Inc., d/b/a Norton Audubon Hospital ("Norton"), alleging

unfair labor practices pursuant to Section 8(a)(3) and (1) of the National Labor Relations Act ("the

Act"). The charges arise out of Norton's decision to terminate Elizabeth Jane Gentry, a registered

nurse and former employee of Norton Audubon Hospital. The Administrative Law Judge ("ALJ")

found that Norton had violated the Act. The Board adopted the ALJ's order with modifications.

_____

[*] The Honorable William H. Stafford, Jr., United States District Judge for the Northern District of Florida, sitting by designation.

For the following reasons, we affirm the decision of the NLRB and grant enforcement of its order.

**I.**

Norton Audubon Hospital is a not-for-profit hospital located in Louisville, Kentucky, and owned by Norton Healthcare, Inc. Norton Healthcare has been operating Norton Audubon since September 1998.

The Union has been attempting to organize the nurses at Norton Audubon since 1989, when Humana, Inc., owned it. The NLRB conducted an election among the Norton Audubon employees that year in which the Union was unsuccessful. Norton Audubon was purchased by Columbia Healthcare Corporation in 1993. Another election was held in 1994, and the Union was again unsuccessful.

The Union filed unfair labor practice charges with the Board regarding the 1994 election. On March 31, 1997, an ALJ issued a decision recommending that the Board order Norton Audubon to bargain with the Union. The ALJ also found numerous violations of Section 8(a)(3) and (1) of the Act. The Board, in reviewing the ALJ's decision, ordered a new election.

In May 1998, the Union learned that Norton Healthcare, Inc., known at the time as Alliant Healthcare, was in the process of purchasing Norton Audubon and urged Alliant to recognize and bargain with the Union in a letter sent to the CEO of Alliant and signed by Gentry. Alliant declined to recognize the Union. After Norton Healthcare assumed control of Norton Audubon, the Union filed a number of unfair labor practice charges against it. The Board found that Norton Healthcare had committed several violations by taking adverse actions against individuals based on their

association with and participation in union activities.[1] *See* 2002 WL 31341800 (NLRB 2002); 2001 WL 1589735 (NLRB 2001).

Gentry began working at Norton Audubon in 1981 as a staff nurse in the coronary care unit. Gentry served as the primary nurse on duty for mechanical heart transplants and had extensive experience working with angioplasty patients. Gentry was generally viewed as a very well-qualified nurse.[2] Gentry joined the Union in the 1980s and served as a trustee and legislative director. Gentry was a self-described "very vocal member" of the Union, handing out authorization cards and union literature, wearing union buttons and speaking publicly as a representative of the Union. Norton Healthcare had stipulated that Gentry's Union activities and support were well-known. In September 1998, after Alliant/Norton Healthcare began operating Norton Audubon, Gentry's supervisor, Steve Williams, told Gentry that he heard that she had been making negative comments about the hospital, and instructed her to stop making such remarks. Gentry testified that she was told that "they were going to be watching [her] to make sure that [she] had corrected her attitude." According to Gentry's testimony, she continued to be active in the union even after this warning.

---

[1]For example, the ALJ's decision in this case cited the following past violations on the part of Norton: (1) issuing a written citation to a nurse for contacting housekeeping employees and asking them to speak to the press regarding Norton's plans to outsource, (2) adopting a solicitation policy that interfered with employees' union rights, (3) failing to hire a Nurses Professional Organization executive board member because of her union involvement, and (4) telling union board members not to discuss the union during work hours.

[2]Chris Ballard, a nurse at Norton Audubon, testified that Gentry was "not an ideal nurse" and that she at times did not satisfactorily perform her job. However, the ALJ expressly declined to credit this testimony, finding that "the personal animosity he has toward Gentry . . . is very apparent" and that "Ballard's testimony on direct . . . appears calculated to cast Gentry in the very worst light."

On October 15, 1998, Gentry was placed on a performance improvement plan due to failure to check a patient's vital signs and "poor conduct and attitude with co-workers and patients."

On June 21, 1999, Dr. William Schmidt performed a balloon angioplasty and stent placement on a ninety-pound, sixty-one year old patient named Faye Jeannette. Jeannette was transferred to the open-heart unit, and Gentry was assigned to care for her. Gentry testified that the nurse who had previously cared for Jeannette told Gentry that Jeannette had undergone a successful surgery, but that she was a very nervous patient who frequently awakened and complained of great pain but soon after fell back asleep without treatment or attention. According to Dr. Schmidt, the probability of experiencing chest pain after a successful angioplasty like Jeannette's was very low, and in such a situation, any chest pain experienced by the patient is more likely due to anxiety. Dr. Schmidt also testified that Jeannette experienced "extreme anxiety" after the surgery, likely because she suffered from bipolar disorder. Gentry testified that she was also informed that Jeannette was given morphine prior to her transfer to the open-heart unit.

Jeannette was connected to two intravenous ("IV") lines through a common portal. Through one IV line, Jeannette received dextrose at half-strength saline solution for rehydration purposes. Through the other, Jeannette received Aggrestat, an anti-coagulant. According to Dr. Schmidt, it is not unusual for a nurse to periodically flush the IV with saline. Mary Gruebbel, Chief Nursing Officer at Norton Audubon, also testified that it is normal procedure to flush a patient's IV with saline and that such an action is not required to be noted on the patient's chart. Gentry testified that Dr. Schmidt prescribed Percocet to Jeannette to relieve pain. Dr. Schmidt testified that he generally prescribes Percocet for back pain, which is common in patients who have undergone angioplasties,

and that he tends not to prescribe morphine for these patients because it can be dangerous to administer that medication post-angioplasty. Dr. Schmidt's orders instructed Gentry that in the event that Jeannette experienced pain, Gentry was to perform an EKG and then administer a nitroglycerin patch after the EKG if Jeannette's systolic blood pressure was above 90.

Gentry testified that she was completing her initial assessment and connecting Jeannette's IVs when Jeannette awoke and said, "I'm dying, I'm dying, you've got to help me, I'm in such pain. Somebody help me, help me, help me." Gentry testified that she looked at Jeannette's monitor and took her heart rate and everything appeared normal. Gentry then flushed Jeannette's IV with saline and Jeannette fell back asleep. Dr. Schmidt's standing orders directed the nurse to report chest pain immediately. Gentry did not report the chest pain immediately, but rather looked over her paperwork to prepare for Dr. Schmidt, because she testified that he was due to be on the floor soon thereafter. Gentry testified that she did not contact Dr. Schmidt because the episode sounded similar to an experience that the nurses had described, because Jeannette had already fallen back asleep, and because she knew that Dr. Schmidt would be arriving on the floor shortly.

Dr. Schmidt arrived on the floor and at that time, Gentry informed him that Jeannette was stable but that she had complained of pain. Gentry told Dr. Schmidt that she had flushed Jeannette's IV with saline and that Jeannette had fallen asleep shortly thereafter. Gentry testified that Dr. Schmidt nodded and then went to check on Jeannette. After examining her, Dr. Schmidt wrote a prescription for Xanax, an anti-anxiety medication, to be administered as needed.

Soon after, Gentry decided to take a break. She asked an agency nurse, Diane McNutt, to watch Jeannette during her break. Gentry testified that she informed McNutt of the episode as well

as Dr. Schmidt's order for Xanax before leaving. When Gentry returned approximately twenty minutes later, McNutt informed her that Jeannette was again complaining of pain. McNutt asked another nurse, Becky Kiesler, for advice regarding how to handle Jeannette. Gentry testified that McNutt told her that Kiesler had directed McNutt to administer morphine to Jeannette. McNutt responded that there was no order for morphine in Jeannette's chart, but Kiesler told her to administer the morphine in any event. McNutt then administered morphine to the patient. According to Kiesler, she obtained a morphine order from the resident on call over the phone.

Gentry then went in to check on Jeannette, who was upset with Gentry for leaving. Gentry found that Jeannette's vital signs were stable. Gentry then flushed Jeannette's IV again with saline. Gentry reviewed Jeannette's chart, and found that Kiesler had written in the morphine order above Gentry's signature on the form, indicating incorrectly that Gentry had acknowledged the order. The notation also neglected to mention which physician had prescribed the medication or the fact that the order had been given over the telephone, which gave the impression that Dr. Schmidt had given the order. After seeing this order, Gentry became very upset and went to find Kiesler.

When Gentry found Kiesler, she told her that what she had done was illegal and that she should never do it again. Kiesler told Gentry that she had spoken with a resident, but Kiesler could not recall the resident's name. Kiesler testified that Gentry told her during the conversation that Jeannette suffered from anxiety and did not need pain medication.

After this conversation, Gentry returned to Jeannette to check on her. According to Gentry's testimony, Jeannette was in stable condition but complained of back pain. Gentry testified that she

administered Percocet to Jeannette at this time. Jeannette suffered no ill effects from the events of that night and was discharged the following day.

Before she left work that night, Gentry stopped Chris Ballard, the Charge Nurse in the open-heart unit, telling him that she wished to speak with him about the events that occurred during her shift. Because Ballard was tired, he asked Gentry to write down her complaint.

Gentry sent an email to Ballard, Supervisor Ladonna Thomas, and open-heart unit manager Randa Bryan regarding the above-described events. In the email, she expressed concern with Kiesler's actions in writing the morphine order on the form above her signature without speaking with a physician. Bryan met with Gentry in early July regarding the email. Gentry described the events of the evening to Bryan, who responded by telling Gentry that she (Gentry) had given Jeannette a placebo, thereby putting the patient in danger. Bryan further stated that Gentry had acted outside the scope of her license by prescribing and administering medicine and that she believed that she was required to report Gentry to the Kentucky Board of Nursing (KBN).[3] Gentry testified that she believed that she had done nothing wrong, but that if she had erred, Bryan could punish her and that she would never repeat the same conduct. Bryan contacted the KBN to find out whether she was required to report Gentry's actions. Bryan told the KBN that Gentry had administered saline in lieu of pain medication to treat pain. The KBN instructed Bryan that such actions would constitute a reportable offense.

---

[3]Kentucky is a mandatory reporting state, meaning that a nurse or employer of a nurse who knows of a violation committed by another nurse must report the occurrence. Ky. Rev. Stat. § 314.031(4).

On July 9, 1999, Gentry was given a notice by Bryan stating that Gentry was being placed on administrative leave without pay for the duration of Norton Audubon's investigation into whether she had practiced outside the scope of her license. Gentry filed a response on union letterhead, stating that she did not believe that she had acted improperly and noted her eighteen year work history at Norton Audubon.

On July 12, 1999, Gentry was terminated for "prescrib[ing] and dispens[ing] a medication to a patient under her care" that was not ordered by a physician and for failing to document the administration of the medication on the patient's chart. Gentry wrote on the acknowledgment form, "I do not agree to the assessment of this situation and I feel like this is a continued harassment of me for my union support."

Kiesler was issued a "Personal Quality Improvement Plan" for failing to properly document the morphine prescription on Jeannette's chart. No other disciplinary action was taken against her. It does not appear that McNutt or any other nurse was disciplined for her part in the treatment of Jeannette.

Bryan also reported Gentry to KBN, which issued a complaint against Gentry. Gentry declined KBN's offer of a settlement. The KBN ultimately found that Gentry had flushed the IV line with the purpose of relieving Jeannette's pain and had failed to document that action on her chart and accordingly placed Gentry under license restrictions. Gentry appealed this decision to the Jefferson County Circuit Court, which reversed the KBN. The court found that the decision to place Gentry on limited/probated status was not supported by substantial evidence, as the patient was not put in danger by Gentry's actions, because flushing an IV with saline is part of routine nursing care

and because such an action need not be documented on a patient's chart. The KBN appealed, and the Kentucky Court of Appeals affirmed this decision.

Gentry filed charges with the KBN in September, 1999, against Kiesler, based on the fact that Kiesler failed to document the prescription for morphine properly and did not speak to a physician before ordering that the drug be administered to Jeannette. Norton had its attorney represent Kiesler, and Gruebbel and Thomas submitted letters of support on her behalf. The KBN credentials panel determined that no formal action was necessary.

The Nurses Professional Organization filed charges against Norton Healthcare, alleging that Norton's actions in terminating Gentry and reporting her to the KBN violated Section 8(a)(3) and (1) of the Act. In November 1999, the NLRB declined to issue a complaint. The Nurses Professional Organization appealed the decision but the appeal was denied. The Nurses Professional Organization filed a motion for reconsideration, which was granted. The Regional Director of the NLRB issued a complaint for both the termination and the KBN reporting on September 14, 2000. Following a hearing, the ALJ found that Norton Healthcare had violated Section 8(a)(3) and (1) of the Act in terminating Gentry and in reporting her to the KBN. The ALJ ordered her reinstatement and reimbursement for lost earnings. In so deciding, the ALJ found that Norton's long history of anti-union animus supported an inference of animus in this case. The ALJ also focused on the verbal warning Gentry was issued based on her negative comments about Norton/Alliant. The ALJ further noted that Gentry was treated much more harshly than other Norton employees who had made errors at work, especially in light of her long and positive history at Norton Audubon and the fact that Jeannette was not harmed in any way by Gentry's actions. The ALJ held that based on its

finding of falsity with regard to Norton's reason for terminating and reporting Gentry, an inference that Norton's true motive was unlawful was warranted. The ALJ also examined the treatment of many other nurses employed by Norton who had violated the Kentucky Nursing statutes and who were treated more favorably than Gentry, including Kiesler.

On January 30, 2004, a three-member panel of the NLRB reviewed the decision of the ALJ and affirmed the ALJ's rulings, findings, and conclusions, but modified the order to require Norton Healthcare to reimburse Gentry for the expenses she incurred in defending herself in the KBN proceedings. Norton Healthcare filed a petition for review with the Sixth Circuit on March 8, 2004. The Board filed a cross-petition for enforcement on April 8, 2004.

## II.

The findings of the NLRB cannot be disturbed provided that they are supported by substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 491 (1951). Substantial evidence exists when, on the record as a whole, evidence is "adequate, in a reasonable mind, to uphold the [Board's] decision." *Turnbull Cone Baking Co. v. NLRB*, 778 F.2d 292, 295 (6th Cir. 1985). This court must review evidence in the record that runs contrary to the Board's decision. *NLRB v. Pentre Elec., Inc.*, 998 F.2d 363, 368 (6th Cir. 1993). This court must uphold the Board's holdings if supported by substantial evidence even if this court would have made a different choice had the matter been before it *de novo*. *Universal Camera*, 340 U.S. at 488.

Norton Healthcare raises four arguments in its petition for review. First, Norton argues that the Board improperly substituted its own judgment for Norton's judgment, thereby violating the business judgment rule. Second, Norton argues that the Board erred in failing to find that Norton

would have fired Gentry even in the absence of her union activity. Third, Norton objects to the Board's finding that Gentry was treated more harshly than other nurses employed at the hospital. Fourth, Norton objects to the Board's award to Gentry of attorneys' fees and expenses incurred as a result of the KBN proceedings.

**A.**

The National Labor Relations Act guarantees employees "the right to self-organization, to form, join, [and] assist labor organizations . . . ." 29 U.S.C. § 157. Section 8(a)(1) makes it an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of [those] rights . . . ." *Id.* § 158(a)(1). Section 8(a)(3) of the Act bans "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." *Id.* § 158(a)(3). An employer who terminates an employee in response to the employee's union activities or membership violates both Section 8(a)(3) and (1). *See, e.g., See, e.g., NLRB v. Oberle-Jordre Co.*, 777 F.2d 1119, 1120-21 (6th Cir. 1985).

Whether Gentry's termination was due to a violation of the Act depends on Norton Healthcare's motive. The test used in determining whether anti-union animus was a motive was developed in *Wright Line, a Div. of Wright Line, Inc.*, 251 N.L.R.B. 1083 (1980) and was adopted by the Supreme Court in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 396, 401-03 (1983), *abrogated on other grounds by Dep't of Labor v. Greenwich Collieries*, 512 U.S. 267 (1994). Under this test, the General Counsel has the initial burden of persuading the Board that anti-union sentiment was a motivating factor in the discharge. *NLRB v. Taylor Mach. Prods., Inc.*, 136 F.3d 507, 514-15 (6th Cir. 1998). Once the initial burden is met, the employer can establish a

defense by showing that even in the absence of the union activity, the employer would have taken the same action. *See id.* "If substantial evidence supports the Board's finding that the employee's protected activity was 'a motivating factor' behind the employer's adverse action, that action is unlawful unless the record considered as a whole supports the employer's affirmative defense that it would have taken the action in the absence of the protected activity." *Id.* at 514 (internal citation and quotation marks omitted).

To establish a prima facie case of unlawful discrimination, the NLRB must establish: (1) the employee was engaged in protected activity; (2) the employer was aware of the protected activity; and (3) an inference that anti-union animus at least partly motivated the employer's adverse employment action or that protected conduct was a motivating factor in the adverse action. *NLRB v. Gen. Fabrications Corp.*, 222 F.3d 218, 226 (6th Cir. 2000). In determining whether the employer possessed an improper motive, the Board may rely on circumstantial as well as direct evidence. *Adair Standish Corp. v. NLRB*, 912 F.2d 854, 861 (6th Cir. 1990). There is no dispute in this case that Gentry was an active union supporter, or that Norton knew of Gentry's union activities. Therefore, only the third factor is at issue.

Discriminatory motivation may be inferred from the employer's expressed hostility to unions, knowledge of the employee's support and activity in a union, the timing of the adverse action, disparate treatment of the employees involved in the union activities and other, non-union involved employees who commit similar offenses, and the inability of the employer to produce a satisfactory justification. *Gen. Fabrications Corp.*, 222 F.3d at 226; *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 871 (6th Cir. 1995). The NLRB makes credibility determinations which the panel may

only reject if they are "inherently unreasonable or self-contradictory." *Wright Tool Co. v. NLRB*, 854 F.2d 812, 815 n.1 (6th Cir. 1988).

Substantial evidence supports the ALJ's findings, adopted by the Board, that Norton's decisions to terminate Gentry and to report her to the KBN were made in response to Gentry's union membership in violation of Section 8(a)(3) and (1). As noted *supra*, Norton concedes that Gentry was involved in the union and that it was aware of her union activities. The ALJ found that an inference of anti-union animus was warranted in this case. In so deciding, the ALJ relied on the history of Norton's anti-union animus, as evidenced by past findings that Norton had engaged in unfair labor practices. The ALJ found evidence of anti-union animus directed specifically at Gentry based on Gentry's credited and uncontroverted testimony that Norton would be watching her to ensure that she had corrected her attitude.[4]

The ALJ also determined that the actions taken against Gentry were excessive, given her solid work history at the hospital, the fact that Gentry had not harmed the patient in any way, a fact uncontroverted by Norton, and the fact that Gentry's action in flushing the patient's IV with saline was not clearly wrong. As the ALJ noted, even assuming that Gentry's action in flushing the IV

---

[4]Norton argues that the sizable length of time between the statements made to Gentry regarding her union activities and the events which underlie the charge of unfair labor practices supports its claim that Gentry's termination was unrelated to her union activity. While it is true that the verbal warning to Gentry pre-dated her termination by approximately nine months, Gentry's union involvement was ongoing and substantial. Furthermore, while the proximity in time between an employee's union activity and an adverse action may support an inference of discrimination, close timing is not required to find a violation of the Act. Based on the record, substantial evidence supports the finding of anti-union animus directed at Gentry.

with saline is most properly considered to be administering a placebo, there did not appear to be a policy issued by the KBN regarding the propriety of such an action.

The ALJ also focused on the extraordinary nature of Norton's decision to terminate Gentry and to report her to the KBN compared to Norton's usual actions in disciplining employees. The ALJ first focused on the testimony of Dr. Alan Lansing, a physician employed by Norton, which revealed that out of twenty-four disciplined nurses, only two had been terminated. In Lansing's opinion, the low level of termination was a result of a general attitude at Norton that nurses should be given a second chance and that Norton "tried to help the nurses." The ALJ noted Gruebbel's testimony stating that what distinguished Gentry from the other nurses who had been disciplined at Norton was the fact that Gentry had practiced outside the scope of her license, thereby making her offense, and consequently the appropriate discipline, much more severe. However, the ALJ found that Gruebbel's testimony on this point was inconsistent with the Kentucky Nursing Statutes and with Norton's disciplinary practices as established through other witnesses, and therefore did not credit Gruebbel's testimony. There is no reason to disturb the ALJ's credibility determination on this point. *See Wright Tool Co.*, 854 F.2d at 815 n.1.

Finally, the ALJ reviewed the factual contexts surrounding the discipline of numerous Norton employees who were either not terminated or not reported to KBN for violations of the Kentucky Nursing Statutes. These past violations include: administering medication through improper means, administering medication at an improper rate, failing to execute physician orders, failure to make essential entries on a patient's file, thereby placing his health in jeopardy, failing to administer prescribed medication, making errors in drug calculations and failing to report these

errors to a supervisor, administering medication in a tardy fashion, and failing to check on patients or to respond to negative changes in a patient's health. The ALJ also noted that another nurse involved in the treatment of patient Jeannette, Becky Kiesler, was not terminated and Norton did not report her to the KBN, despite the fact that her actions appeared to be in violation of the Kentucky Nursing statutes. The ALJ noted that approximately two years after reporting Gentry, Norton reported three nurses who engaged in conduct similar to the conduct at issue in this case. However, the ALJ determined that Norton's reporting of these three nurses was irrelevant to the question of whether Gentry was disparately treated, both because Gentry appeared to be singled out at the time the adverse action was taken against her and because the ALJ surmised that Norton may have reported these nurses in response to the filing of the instant complaint.

Norton does not argue that the ALJ erred in his understanding of the facts underlying the past disciplinary action against Norton nurses. Rather, Norton argues that the ALJ compared Gentry to nurses with whom she was not similarly situated. Therefore, Norton argues that the fact that Gentry was treated more harshly than the other nurses is not a product of union animus, but is rather due to the fact that Gentry committed a more serious violation. Norton's argument on this point fails. In deciding whether the employer was motivated by hostility toward the union, the ALJ may rely on "'disparate treatment of certain employees compared to other employees with similar work records or offenses.'" *Ky. Gen., Inc. v. NLRB*, 177 F.3d 430, 435-36 (6th Cir. 1999) (quoting *Hyatt Corp. v. NLRB*, 939 F.2d 361, 375 n.7 (6th Cir. 1991)). Past case law does not require that the conduct be identical, and the conduct of the nurses with whom Gentry was compared was

sufficiently similar such that the ALJ's decision to rely on the comparisons was proper.[5]  Further,

Gruebbel testified that Gentry's conduct was distinguishable from the other nurses' conduct because

she was acting outside the scope of her license, but the ALJ found Gruebbel's testimony not credible

on this point.  As a result, the ALJ was correct in relying on the other nurses as comparators, and

the existence of these numerous instances of more favorable treatment for similar offenses supports

the ALJ's finding of an inference of discriminatory animus.

Based on the foregoing reasoning, substantial evidence supports the ALJ's finding of a prima

facie case of unlawful discrimination.  The burden then shifts to Norton to prove an affirmative

defense.  The ALJ rejected Norton's proffered reason for terminating and reporting Gentry, and

found that Norton's argument that Gentry was acting outside the scope of her license was pretextual.

Norton argues that the Board impermissibly substituted its own judgment for Norton's in finding

that Norton had engaged in unfair labor practices in terminating Gentry.  The essential question is

not "whether the business reasons cited by [the employer] were good or bad, but whether they were

honestly invoked and were, in fact, the cause of the change." *Ryder Distrib. Res., Inc.*, 311 N.L.R.B.

814, 816 (1993) (quoting *NLRB v. Savoy Laundry*, 327 F.2d 370, 371 (2d Cir. 1964).  In this case,

the ALJ did not hold that Norton had made a "good" or "bad" decision in terminating Gentry for her

treatment of Jeannette, but rather that the reason Norton had given in firing Gentry was false, and

that the true motivation behind the termination was Norton's animus toward Gentry's union

activities.  The ALJ reached this conclusion by examining the treatment of other employees who

---

[5]Contrary to Norton's argument, the conduct of a number of comparators in fact appears substantially more serious than that of Gentry.

were treated more favorably than Gentry coupled with the fact that Gentry's actions were not clearly improper and did not put the patient's life in jeopardy. The ALJ also relied on the fact that Gentry had a positive work history at Norton Audubon. Because the ALJ rejected Norton's asserted reason for the adverse actions taken against Gentry, and because substantial evidence in the record supports the ALJ's decision to do so, Norton's argument fails.

Norton's next argument–that it was entitled to protection under the *Wright Line* defense because it would have taken the same action regardless of Gentry's union involvement–fails for the same reason. *See Wright Line*, 251 N.L.R.B. at 1087. In holding that Norton's stated reason for terminating and reporting Gentry was pretextual, the ALJ implicitly found that Norton would not have taken the same action if Gentry had not been involved in the union. The ALJ's decision on this point was supported by substantial evidence, as discussed *supra*, and therefore, this argument fails.

**B.**

In adopting the ALJ's decision, the Board modified the judgment to award Gentry legal expenses incurred in defending herself before the KBN. Norton argues that the decision to award Gentry legal expenses is precluded by the Supreme Court's decision in *BE & K Construction Co. v. NLRB*, 536 U.S. 516 (2002). The *BE & K Construction* decision held that the Board cannot impose liability under the National Labor Relations Act for unfair labor practices based on the employer's reasonably based but unsuccessful lawsuit against a union even where the employer had a retaliatory purpose in filing the lawsuit. *Id*. at 536-37. The lawsuit filed by the employer must be subjectively genuine as well as objectively reasonable to garner protection under *BE & K Construction. Id.* at 535-36.

We reject this argument. First, *BE & K Construction*'s holding addresses whether liability, rather than attorneys' fees, can be imposed for the employer's filing of a lawsuit. Thus, it would appear that Norton should have raised this argument before the ALJ and the Board with respect to the imposition of liability under Section 8(a)(3) and (1) of the Act for Norton's actions in reporting Gentry to the KBN. To the extent that Norton's argument regarding the imposition of legal expenses can be construed as an attempt by Norton to attack the finding of liability collaterally, Norton failed to raise this argument previously, and thus we reject the argument. *See Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).

Further, the *BE & K Construction* opinion does not operate to preclude the grant of legal expenses to Gentry in this case. The Supreme Court held in *BE & K Construction* that liability under the National Labor Relations Act could not be imposed because the imposition of liability in that case would interfere with the employer's First Amendment right to access to the courts. 536 U.S. at 529-34. Thus, the *BE & K Construction* decision was grounded in ensuring an entity's right to protect its own interests through court proceedings. *Id*. at 530-33. In contrast, the Supreme Court held in *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 896-97 (1984) that an employer who reported undocumented aliens to the Immigration and Naturalization Service was not entitled to First Amendment protection because the employer was not "seek[ing] the redress of any wrongs committed against [it]." *Id*. at 897. The Court stated further that "private persons . . . have no judicially cognizable interest in procuring enforcement of the immigration laws by the INS." *Id.*

Similarly, Norton does not have a judicially cognizable interest in the enforcement of Kentucky Nursing statutes by the Kentucky Board of Nursing. Norton did not report Gentry based

on wrongs committed against it, nor was Norton attempting to avail itself of access to the courts by

filing a direct suit against Gentry or the union.  Therefore, Norton is not entitled to protection under

the First Amendment for reporting Gentry.[6]  We affirm the award of attorneys' fees.

## III.

For the foregoing reasons, we enforce the Board's order in full.

---

[6]Norton notes in its brief that it was required to report any nurse who is "suspected of negligently or willfully acting in a manner inconsistent with the practice of nursing." Ky. Rev. Stat. § 314.031(4)(c). Despite this obligation, Norton has nonetheless failed to identify a personal interest substantial enough to protect it from liability or an order paying legal expenses under the First Amendment.