**NOT RECOMMENDED FOR PUBLICATION**

File Name: 20a0503n.06

Case Nos. 19-2356/2397

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| NATIONAL LABOR RELATIONS BOARD, | ) | **FILED**<br>Aug 27, 2020<br>DEBORAH S. HUNT, Clerk |
|  | ) |  |
| Petitioner/Cross-Respondent, | ) |  |
|  | ) | ON APPLICATION FOR |
| v. | ) | ENFORCEMENT AND CROSS- |
|  | ) | PETITION FOR REVIEW OF AN |
| ROEMER INDUSTRIES, INC., | ) | ORDER OF THE NATIONAL |
|  | ) | LABOR RELATIONS BOARD |
| Respondent/Cross-Petitioner. | ) |  |
|  | ) |  |

**BEFORE:  GILMAN, BUSH, and READLER, Circuit Judges**

**JOHN K. BUSH, Circuit Judge.** Roemer Industries, Inc. ("Roemer") petitions for review of a decision by the National Labor Relations Board (the "Board"), and the General Counsel for the Board applies for enforcement of the same. The Board found that Roemer violated § 8(a)(1) and (3) of the National Labor Relations Act by terminating Bruce Haas for engaging in protected activity. We hold that substantial evidence supports the Board's decision, and therefore **GRANT** the General Counsel's application for enforcement and **DENY** Roemer's petition for review.

**I.**

Roemer manufactures industrial identification nameplates in Masury, Ohio. The company has approximately twenty production and maintenance employees, all of whom have been

represented by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (the "Union") since 1973.

Bruce Haas began working for Roemer in 1976 and was its most senior employee before his termination. He held many different roles over the years and was working in fabrication at the end of his tenure. In the last few years before his discharge, he earned positive performance evaluations, and he was described as a reliable employee who had his own way of performing his work but knew what he was supposed to be doing. However, Haas's performance reviews and disciplinary records at Roemer were spotty over the years, and he received discipline short of discharge on multiple occasions throughout his tenure.

Haas's conduct at issue here related to the collective-bargaining agreement ("CBA") between Roemer and the Union. Their most recent CBA expired on April 22, 2016. Roemer and the Union began negotiating a successor contract in March 2016, but they failed to reach an agreement. At the time of the trial in this case, the parties had not reached an agreement on a CBA. In those negotiations, Roemer was represented by outside counsel, and the Union was represented by United Steelworkers Business Agent Jose Arroyo and Union Steward Ron Merrick.

A main point of disagreement in the negotiations was whether the successor contract would continue to require employees to become Union members (as the Union wanted) or if it would convert Roemer to an "open shop" in which employees could choose whether or not to be Union members (as Roemer wanted). Joseph O'Toole, Roemer's president and owner, indicated that transitioning to an open shop was essential to his ability to sell the company, but the Union saw an open-shop provision as non-negotiable.

In the summer of 2016, while contract negotiations were ongoing, Haas and other employees demonstrated support for the Union's position by displaying signs on their cars that

bore the Union's logo and stated "Fair Contract Now." Those signs were provided by the Union and distributed by Merrick in the Roemer parking lot. O'Toole asked Merrick for a "Fair Contract Now" sign and covered the Union logo with a "Roemer" logo. He then posted the modified sign on a doorway inside the building.

In August, Haas had a conversation with Amanda Shinkovich, Roemer's quality manager, and asked whether the stalled contract negotiations were causing as much stress in the office as among bargaining-unit employees in the shop. The next day, O'Toole brought Haas into his office and asked why he had asked Shinkovich that question. O'Toole instructed Haas to repeat the question to another manager and Roemer's bargaining representative. O'Toole then walked Haas around the office and made him repeat the question to approximately twelve other employees.

In addition to the "Fair Contract Now" signs provided by Merrick, Haas showed additional support for the Union's position, and opposition to the open-shop proposal, by asking his niece to make bumper stickers bearing the words "Open Shop" enclosed in a prohibition sign. Haas also distributed these "No Open Shop" bumper stickers to his coworkers in the parking lot as Merrick had done with the "Fair Contract Now" signs. He did so before work for a few days and then left a box of the stickers in his unlocked car and told his coworkers to help themselves. Other employees availed themselves of his offer and displayed the "No Open Shop" stickers.

There is conflicting testimony about the timing of these events. Haas testified that he received the stickers from his niece and distributed them to his coworkers sometime in mid-September 2016. Roemer employee Harold Hrabowy testified that he remembered Haas handing out the stickers shortly before he was terminated, but Hrabowy could not be more specific than to recollect that the incident occurred when the weather was still warm enough to ride a motorcycle.

Merrick testified that he remembered Haas's handing out the stickers a couple months before he was terminated.

By virtue of his long tenure at Roemer, Haas had an assigned parking spot near the front of the lot. That parking spot is visible on security-camera footage that was regularly viewed by O'Toole and Ann Fraley, Roemer's Production Supervisor. Fraley and Shinkovich parked in the same lot, as did O'Toole on occasion.

On September 14, 2016, Haas was assigned a job of shearing aluminum into smaller strips. Rather than use a cart to move the sheared strips to the next work station, as dictated by Roemer policy, Haas hand carried the material in two trips. O'Toole saw Haas carry the first handful and instructed him to use a cart, but Haas refused, stating instead that there were no carts in the area. After Haas dropped off the first handful of strips, he returned to the work station and continued shearing the remainder of the order. Haas hand carried the second load of materials, and O'Toole again observed the conduct and reprimanded Haas. Fraley overheard the second interaction and approached Haas to ask why he did not obey O'Toole's instruction and use a cart. Haas replied that it would take longer to look for a cart than to just carry the materials. Fraley then pointed to a cart in the immediate vicinity and brought it to Haas.

Fraley testified that she approached O'Toole later in the day and said that Haas should be written up for insubordination. Under Roemer policy, insubordination is considered an "intolerable" offense and the employee will be sent home immediately. The offense could warrant elevation to an immediate three-or five-day suspension. However, Haas was not disciplined that day. Instead, he received a disciplinary notice two weeks later on September 30th from O'Toole for a "quality of work" violation, which gave as the reason the failure to use the "Theory of

Constraints methodology."[1]  The "Theory of Constraints" is a philosophy promoting efficiency that O'Toole ascribed to, and he provided management-level employees with a book about this philosophy when they were promoted to managerial positions.  There is no evidence that bargaining-unit employees were provided any specific training on the philosophy.

The disciplinary notice provided for a five-day suspension pending discharge, and was set to run from October 10th through October 14th.  Roemer's internal disciplinary policy follows a sequence, from warnings, to suspension, to discharge.  That escalating discipline provides a verbal warning for the first offense, written warning for the second offense, one-day suspension for the third offense, three-day suspension for the fourth offense, and a five-day suspension pending discharge for the fifth offense.  A discipline stays in an employee's file for one year, unless the employee receives another infraction.  Notwithstanding the progressive nature of the disciplinary system, O'Toole testified that he exercises discretion in implementing this policy, including skipping disciplinary steps (and imposing punishment at the higher end of the range) and also by retaining employees who reach the end of the disciplinary progression.

It is undisputed that at the time of his notice, Haas had accumulated four previous disciplinary events and the next step was a five-day suspension pending discharge.  As indicated, however, this was not Haas's first experience with multiple disciplinary events on his record.  His disciplinary records show that he had twice reached the five-day suspension level for unsatisfactory work quality, receiving a five-day suspension in July 2002.  When he was again suspended for the same violation in June and September 2003, O'Toole allowed Haas to opt for a decrease in certification (and pay) along with a three-day suspension rather than termination.

---

[1] The full disciplinary notice stated: "Not using 'Theory of Constraints' methodology.  Specifically, hand carrying, in a piecemeal manner, work to a shelf near next work station instead of using an available cart."  Dkt. 7 at 701.

Haas also received a discipline in 2013 for incorrectly cutting parts, and he filed a grievance disputing the discipline. Union officers Merrick and Geraldine Dolta attempted to investigate the grievance, but O'Toole suspended them for their efforts. This led to a separate proceeding in which the Board found that Roemer had discriminated against Merrick and Dolta for engaging in protected union activity, and this court enforced the Board's order. *Roemer Indus., Inc. v. NLRB (Roemer I)*, 688 F. App'x 340 (6th Cir. 2017). That case had not been resolved at the time of Haas's termination.

Haas's suspension went into effect on October 10th as planned, and he was terminated in a letter dated October 11th. The letter did not provide a reason for his discharge. The Union grieved the discharge, which Roemer denied, and Roemer declined to participate in arbitration.

After Haas was terminated, strained contract negotiations between Roemer and the Union continued. On January 3, 2017, a management group consisting of O'Toole, Shinkovich, and Fraley called three bargaining-unit employees into a meeting, and O'Toole informed them that Roemer's representative was a "union-busting lawyer." O'Toole asked for input about how to expedite negotiations, and one employee suggested that Roemer drop its open-shop proposal. O'Toole refused, and asked if the employees wanted to continue working at Roemer. Roemer also failed to provide information to the Union during negotiations upon their request.

On May 10th, O'Toole unilaterally increased all employees' pay without giving the Union the opportunity to bargain. When the Union demanded bargaining, and subsequently filed an unfair-labor-practice charge based on Roemer's refusal, O'Toole rescinded the pay increase and blamed the Union. The pay increase was later reinstated. During a meeting in mid-June 2017, O'Toole told Merrick that employees are gullible, that nobody trusted or liked Merrick, and that there would be a closed shop "over [O'Toole's] dead body."

The Board's General Counsel brought a complaint alleging that Roemer engaged in unfair labor practices in violation of Section 8(a)(3) and (1) of the National Labor Relations Act, as amended (the "Act"), 29 U.S.C. § 158(a). The case was tried before an administrative law judge ("ALJ"). The ALJ issued a decision finding that O'Toole and Roemer had violated the Act.

The Board, in a three-member panel, largely adopted the ALJ's recommendation and affirmed the rulings against Roemer. The Board further found that Roemer violated § 8(a)(1), (3), (4), and (5) of the Act. The Board found that Roemer violated § 8(a)(1) when O'Toole stated he had hired a union-busting attorney and implicitly threatened employees' continued employment and the continuation of a training program. The Board also found that Roemer violated § 8(a)(5) by failing to provide relevant information requested by the Union and dealing directly with Union employees, and violated § 8(a)(4), (3), and (1) by unilaterally implementing and rescinding a wage increase. As relevant here, the Board found that Roemer violated § 8(a)(3) and (1) of the Act by suspending and terminating Haas. The Board accordingly entered an order requiring Roemer to remedy its various violations and to reinstate Haas's employment.

The parties subsequently settled all alleged violations except those relating to Haas's discharge. Roemer now petitions for review of the order that it reinstate Haas's employment, and the Board applies for enforcement of the same.

## II.

"Pursuant to 29 U.S.C. § 160(e), this court reviews the factual determinations made by the NLRB under the substantial evidence standard." *Airgas USA, LLC v. NLRB*, 916 F.3d 555, 560 (6th Cir. 2019) (quoting *NLRB v. Local 334, Laborers Int'l Union of N. Am.*, 481 F.3d 875, 878–79 (6th Cir. 2007)).[2] Accordingly, "we must uphold the NLRB's factual determinations if they

---

[2] In relevant part, 29 U.S.C. § 160(e) provides that "[t]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."

are supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, even if we may have reached a different conclusion had the matter been before us de novo." *Id.* (cleaned up). But our review is "even more deferential" when credibility is at issue, and we will overturn such credibility determinations "'only if they overstep the bounds of reason' or 'are inherently unreasonable or self-contradictory.'" *Id.* (quoting *Caterpillar Logistics, Inc. v. NLRB*, 835 F.3d 536, 542 (6th Cir. 2016). Legal conclusions are reviewed de novo. *Conley v. NLRB*, 520 F.3d 629, 638 (6th Cir. 2008) (per curiam) (citing *3750 Orange Place Ltd. P'ship v. NLRB*, 333 F.3d 646, 654 (6th Cir. 2003)).

Section 8 (a)(1) of the Act makes it an unfair labor practice for an employer to "interfere with employees exercising the right guaranteed them by § 7 of the Act to act in concert for mutual aid and protection."[3] *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 870 (6th Cir. 1995) (citing 29 U.S.C. § 158(a)(1)). Section 8(a)(3) in turn "makes it an unfair labor practice for an employer to discriminate against employees with regard to terms or tenure of employment for the purpose of discouraging membership in a labor organization."[4] *Id.* "An employer who terminates an employee in response to the employee's union activities or membership violates both Section 8(a)(3) and (1)." *Norton Healthcare, Inc. v. NLRB*, 156 F. App'x 745, 751 (6th Cir. 2005) (citing *NLRB v. Oberle-Jordre Co.*, 777 F.2d 1119, 1120–21 (6th Cir. 1985)).

We consider this claim under the standard established in *Wright Line*, 251 N.L.R.B. 1083 (1980), and approved by the Supreme Court in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 401 (1983). *See Charter Commc'ns, Inc. v. NLRB*, 939 F.3d 798, 815 (6th Cir. 2019);

---

[3] Section 8(a)(1) provides that it "shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. § 158(a)(1).

[4] Section 8(a)(3) provides in relevant part that it "shall be an unfair labor practice for an employer by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

*FiveCAP, Inc. v. NLRB*, 294 F.3d 768, 777 (6th Cir. 2002). Under the *Wright Line* framework, "the General Counsel has the initial burden of persuading the Board that anti-union sentiment was a motivating factor in the discharge." *Norton Healthcare, Inc.*, 156 F. App'x at 752 (citing *NLRB v. Taylor Mach. Prods., Inc.*, 136 F.3d 507, 514–15 (6th Cir. 1998)). To do so, "the General Counsel must demonstrate . . . (1) [that] the employee was engaged in protected activity; (2) that the employer knew of the employee's protected activity; and (3) that the employer acted as it did on the basis of anti-union animus." *Airgas USA, LLC*, 916 F.3d at 561 (quoting *FiveCAP*, 294 F.3d at 777).

If the General Counsel establishes a prima facie case, "the burden shifts to the employer to prove by a preponderance of the evidence that the employee would have been fired for permissible reasons even if he had not been involved in activity protected by [the Act]." *NLRB v. Overseas Motor, Inc.*, 721 F.2d 570, 571 (6th Cir. 1983); *see FiveCAP, Inc.*, 294 F.3d at 777–78. However, "[i]f the employer's proffered justification for the decision is determined to be pretextual, the Board is not obligated to consider whether the employer would have taken the same decision regardless of the employee's union activity." *Airgas USA, LLC*, 916 F.3d at 561 (quoting *Ctr. Const. Co., Inc. v. NLRB*, 482 F.3d 425, 435–36 (6th Cir. 2007)).

### A. Prima Facie Case

#### 1. Protected Activity

The parties do not dispute that Haas engaged in protected activity when he produced and distributed the "No Open Shop" bumper stickers to other Roemer employees in the midst of a significant dispute over the inclusion of an open-shop provision in the anticipated collective bargaining agreement. *See Mt. Clemens Gen. Hosp. v. NLRB*, 328 F.3d 837, 844 (6th Cir. 2003) (explaining that "wear[ing] pins or stickers 'in an effort to encourage [an employee's] coworkers

to support the Union's' position on a matter . . . 'constitute[s] protected, concerted activity'" (quoting *St. Luke's Hosp.*, 314 N.L.R.B. 434, 435 (1994) (second and third alterations in original)).

Moreover, the Board found that Haas also engaged in other protected activities, such as displaying the "Fair Contract Now" sign distributed by the Union, filing the grievance that led to *Roemer I*, and complaining about working conditions and O'Toole's management. Roemer does not dispute that this additional conduct is "protected activity." Instead, Roemer contends that the charges were brought only on the basis of the "No Open Shop" stickers, and that the ALJ violated Roemer's due-process rights by expanding the scope of the complaint to include these additional NLRA-protected activities. Roemer also contends that some of these activities, such as filing grievances, are outside the applicable statute of limitations.

We are without jurisdiction to consider Roemer's argument. "No objection that has not been urged before the Board, its member, or agency shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e); *Woelke & Romero Framing, Inc. v. NLRB*, 456 US 654, 665 (1982) (explaining that "the Court of Appeals was without jurisdiction to consider" an issue not raised before the Board). "Any exception to a ruling, finding, conclusion or recommendation which is not specifically urged will be deemed to have been waived," 29 C.F.R. § 102.46(a)(1)(ii), and the exception must "[c]oncisely state the grounds for the exception," *id.* § 102.46(a)(1)(i)(D).

Roemer argues that it properly preserved its procedural-due-process and statute-of-limitations arguments by filing general exceptions to the ALJ's decision. For example, Roemer points to its exceptions to the ALJ's findings of fact and conclusions of law "at p. 21, lines 36-41," and "at p. 22, lines 22-26." Dkt. 7 at 1092 ¶¶ 12–13. But these general exceptions are insufficient because they "fail to allege with any degree of particularity the error [Roemer] contends the [ALJ]

10

committed, or on what grounds it believes the [ALJ's] decision as to this violation should be overturned." *Conley*, 520 F.3d at 638 (internal quotation marks omitted). Section 10(e) was enacted to "provide the Board the opportunity to consider, on the merits, the questions to be urged in a review of its order by an appellate court." *NLRB v. Triec, Inc.*, 946 F.2d 895 (6th Cir. 1991) (per curiam) (table). Roemer never provided the Board the "opportunity to consider" its argument that the ALJ had impermissibly broadened the scope of the protected conduct at issue.[5]

Roemer nevertheless argues that we should consider its procedural-due-process argument seemingly because of the nature of the alleged error. Roemer relies on *NLRB v. Blake Construction Co.*, 663 F.2d 272, 283 (D.C. Cir. 1981). There, the employer's procedural-due-process rights were violated when the Board granted relief not only in favor of union members (as sought in the complaint and litigated at trial), but also in favor of other employees who were not union members. *See id.* at 282–83. The court held that the employer had not waived this argument because it had argued before the Board that the ALJ's findings in favor of the non-union members "were not supported by the evidence and that no notice was given in the complaint as to such violations." *Id.* at 284. The court explained that this objection was sufficiently particular to preserve the argument, finding it "considerably more focused and quite different from the general pro forma objections found to be impermissibly vague." *Id.* Roemer does not claim that it argued before the Board that the ALJ's findings went beyond the scope of the complaint or relied on conduct outside the statute of limitations. Roemer also does not claim that any "exceptional circumstances" would warrant review, and we find none.

---

[5] Indeed, as the General Counsel points out, the broad language of the Complaint extends well beyond the "No Open Shop" stickers, stating that Roemer terminated Haas "because [Haas] assisted the Union and engaged in concerted activities, and to discourage employees from engaging in these activities." Dkt. 7 at 629.

### 2. Knowledge

The Board also found that Roemer had knowledge of Haas's protected activity. Roemer does not dispute that it had knowledge of the grievances Haas filed, the "Fair Contract Now" sign posted on Haas's car, or Haas's complaints about the conditions of his employment. Roemer's only argument as to these activities—which we have already rejected—is that the ALJ improperly expanded the scope of the complaint by considering these additional protected activities.

Even if we were to consider only the creation and distribution of the "No Open Shop" bumper stickers, however, we would still hold that the Board's conclusion is supported by substantial evidence.[6] Haas openly distributed the bumper stickers in the parking lot near the front of the building before work for several consecutive days. He also left a box of the bumper stickers in his car with an open invitation for other employees to "help themselves" to the stickers. The parking lot was the subject of a surveillance camera that O'Toole regularly viewed in the morning. Moreover, some members of management, and sometimes O'Toole himself, parked in the lot and would have walked past Haas's car with the sticker displayed. This supports a finding of knowledge. *See Holsum De P.R., Inc. v. NLRB*, 456 F.3d 265, 270 (1st Cir. 2006) (finding substantial evidence of knowledge of union activities conducted in plain view in an open parking lot where the activities "could very well have been observed by any number of supervisors and managers").

O'Toole's close monitoring of union activities further supports the Board's finding. Soon after Merrick began distributing the "Fair Contract Now" signs, O'Toole asked for one and modified it by covering the Union logo with a Roemer logo. Further, the day after Haas commented to Shinkovich that the stalled negotiations around the collective bargaining agreement

---

[6] Contrary to Roemer's contention that the ALJ "implicitly rejected" this theory of knowledge, the ALJ stated "[Roemer] knew of Haas' union activities, including distributing the 'no open shop' stickers." Dkt. 7 at 1168.

were causing stress among workers in the shop, O'Toole knew about the comment and reacted by forcing Haas to go repeat his comment to a dozen or more employees. We have previously found an inference of knowledge proper in the context of a "small company, with a 'hands-on' president." *NLRB v. Gen. Fabrications Corp.*, 222 F.3d 218, 226 (6th Cir. 2000).

The Board also properly found that the small-plant doctrine bolstered the inference of knowledge. "The essence of the small plant doctrine 'rests on the view that an employer at a small facility is likely to notice union activities at the plant because of the closer working environment between management and labor.'" *NLRB v. Health Care Logistics, Inc.*, 784 F.2d 232, 236 (6th Cir. 1986) (quoting *Alumbaugh Coal Corp. v. NLRB*, 635 F.2d 1380, 1384 (6th Cir. 1980)). The inference was proper here in light of the other circumstantial evidence, as discussed above, that Roemer had "reason to notice the union activities." *See id.* (inferring knowledge based on evidence of open discussions about a union and timing of the discharge).

### 3.     Anti-Union Animus

"The remaining element, anti-union animus, may be 'inferred from purely circumstantial as well as direct evidence.'" *Airgas USA, LLC*, 916 F.3d at 561 (quoting *W.F. Bolin Co.*, 70 F.3d at 871). Such circumstantial evidence evincing anti-union animus includes

> the company's expressed hostility towards unionization combined with knowledge of the employees' union activities; inconsistencies between the proffered reason for [discipline] and other actions of the employer; disparate treatment of certain employees compared to other employees with similar work records or offenses; a company's deviation from past practices in implementing the [discipline]; and proximity in time between the employees' union activities and their [discipline].

*Id.* (alterations in original) (quoting *W.F. Bolin Co.*, 70 F.3d at 871); *see also FiveCAP*, 294 F.3d at 778.

We find that substantial evidence supports the Board's conclusion that anti-union animus motivated Haas's discharge. First, the Board relied on Roemer's general anti-union animus, as

demonstrated by the discrimination against Merrick that led to the earlier litigation in *Roemer I* (which was still unresolved at the time of Haas's termination), and Roemer's other unfair labor practices at issue in the underlying complaint such as Roemer's unilateral increase and rescission of a pay raise, direct dealing with employees, and coercive statements to employees. An employer's conduct both before and after the termination can be properly considered in determining the "true motivation" for the discharge. *See SCA Tissue N. Am. LLC v. NLRB*, 371 F.3d 983, 989 (7th Cir. 2004) (citing *Local Lodge No. 1424, Int'l Assoc. of Machinists v. NLRB*, 362 U.S. 411, 416 (1960)) (considering conduct before the discharge and outside the statute of limitations in assessing anti-union animus); *id.* at 990 (citing *NLRB v. Rich's Precision Foundry, Inc.*, 667 F.2d 613, 619–20, 626 (7th Cir. 1981)) (finding Board's consideration of post-termination conduct proper).

Second, the Board relied on the timing of Haas's termination. Haas, Merrick, and Hrabowy all testified that Haas distributed the "No Open Shop" stickers shortly before his termination. Haas testified that he distributed the stickers approximately two weeks before his termination, which is certainly close enough temporally to support an inference of animus. *See Airgas USA, LLC*, 916 F.3d at 563–64 (finding period of "just under a month" between protected activity and discipline supported finding of animus); *NLRB v. E.I. DuPont De Nemours*, 750 F.2d 524, 529 (6th Cir. 1983) (three weeks). Even Merrick's longer estimate of two months falls within the time frame that this court has acknowledged supports a finding of animus. *See Charter Commc'ns, Inc.*, 939 F.3d at 815 (holding that even a time period of three months can "raise concerns" about animus). The termination also came shortly after the incident in August in which O'Toole required Haas to go repeat his question about increased union tensions to at least a dozen other employees.

This timing is particularly notable against a backdrop of Roemer's tolerance for similar job-related conduct from Haas over the years. *See Conley*, 520 F.3d at 643–44 (finding anti-union animus when employer terminated an employee for previously tolerated conduct). As both parties emphasize, Haas has been disciplined for similar conduct regularly throughout his forty-year tenure at Roemer. Yet Roemer always offered Haas some form of leniency or relief until his display of union support at what likely seemed, at the time, to be the zenith of conflict between Roemer and the Union in the deadlocked contract negotiation. The ALJ and the Board were not persuaded that Roemer was "ultimately exhausted" with this conduct precisely when union tensions were flaring. See Dkt. 7 at 1170 (citing *Garvey Marine, Inc. v. NLRB*, 245 F.3d 819, 825 (D.C. Cir. 2001)).[7]

Finally, the Board noted that Roemer's justifications for Haas's termination have not been consistent. O'Toole wrote that Haas was disciplined for failing to adhere to the "Theory of Constraints methodology," even though the Board found that non-managerial employees receive no training in the Theory of Constraints. Fraley testified that she recommended that Haas be disciplined for insubordination, but his discipline did not follow the ordinary protocol for insubordination in which the insubordinate employee would be sent home immediately. Fraley also testified that she had recommended terminating Haas, even though she had previously stated that she did not play any role in his termination.

---

[7] Roemer argues that *Conley* is inapposite because it did not involve a progressive disciplinary policy. But the point is that Roemer had previously applied its own disciplinary policy with some degree of leniency toward Haas, offering him a "last chance agreement" or allowing him to opt for punishment short of discharge. Roemer's reliance on *NLRB v. Cook Family Foods, Ltd.* is unconvincing because that case involved employees who performed poorly during a training program and were terminated when they were unable to perform their duties after the training period had ended. *See* 47 F.3d 809, 817 (6th Cir. 1995). In contrast, Haas was a forty-year employee with a consistent track record of similar conduct. And in none of Roemer's cases did the employer require the discriminatee to walk around the office repeating a statement about union-related stress as an act of self-flagellation shortly before termination.

Relying on *Electrolux Home Products*, 368 N.L.R.B. No. 34, 2019 WL 3562131 (Aug. 2, 2019), Roemer argues that the Board improperly based its decision on temporally distant events and gave insufficient weight to "comparator" evidence of other employees who displayed "Fair Contract Now" signs but were not terminated. We disagree. As an initial matter, Roemer's argument about comparator evidence is unpersuasive because it relies exclusively on evidence about other employees who displayed "Fair Contract Now" signs; it presents no evidence of any other employee who engaged in the same conduct as Haas, including but not limited to producing and distributing the "No Open Shop" bumper stickers. As to the temporal relationship, the Board in *Electrolux* found that a single display of anti-union animus seven months before the discharge was insufficient to find that the discharge was motivated by animus. *See id.* at *4–5. The Board emphasized that the record contained countervailing evidence against the finding that the employer harbored anti-union animus because the employer had "quickly reached an interim agreement" with the union on certain issues and had "begun meeting and bargaining in good faith." *Id.* at *5. In contrast, the activity at issue here happened either two weeks or two months before the discharge, and the record demonstrates a litany of contemporaneous unfair labor practices that Roemer does not now contest.

Roemer also contends that the Board erred by relying exclusively on general union animus and failed to find the requisite causal link between animus and the adverse employment action. Roemer relies on *Tschiggfrie Properties, Ltd.*, 368 N.L.R.B. No. 120, 2019 WL 6320585 (Nov. 22, 2019) for support. However, as we have recently explained, that case holds only that "'the General Counsel does not *invariably* sustain his burden' at the first step of the *Wright Line* analysis 'by producing . . . *any* evidence of the employer's animus or hostility toward union or other protected activity." *Challenge Mfg. Co., LLC v. NLRB*, --- F. App'x ---, 2020 WL 3060747, at *4

16

(June 9, 2020) (quoting *Tschiggfrie Props., Ltd.*, 368 N.L.R.B. No. 120, 2019 WL 6320585, at *10). Here, the Board did not rely solely on general union animus, but instead made specific factual findings connecting Haas's protected activity to the termination. *See id.* (holding that Board's nexus finding was sufficient when the ALJ "found that the timing of [the employee's] discharge and the evidence of disparate treatment supported an inference of anti-union animus connected to the discharge" (internal quotation marks omitted)).

*     *     *

In sum, the Board's finding that the General Counsel satisfied its prima facie burden is supported by substantial evidence.

### B.      Proffered Justification

"Under the *Wright Line* framework, once the General Counsel establishes a prima facie case, the employer may mount an affirmative defense by showing that it would have taken the same action even without any anti-union animus." *Challenge Mfg. Co., LLC*, --- F. App'x at ---, 2020 WL 3060747, at *5. "If the employer's proffered justification is determined to be pretextual, the Board need not consider it." *Airgas USA, LLC*, 916 F.3d at 565 (quoting *Ctr. Const. Co.*, 482 F.3d at 435–39).

Roemer contends that the Board erred because, under Roemer's progressive-discipline policy, it had authority to terminate Haas for a quality-of-work violation. As Roemer points out, Haas had a long history of documented violations, and there is no dispute that the next step along his discipline path was a five-day suspension pending discharge.

However, the question is not whether Roemer could have terminated Haas for the proffered reasons; it is "whether [the reasons] were honestly invoked and were, in fact, the cause of the [discharge]." *See Norton Healthcare, Inc.*, 156 F. App'x at 754 (quoting *Ryder Distrib. Res., Inc.*,

311 N.L.R.B. 814, 816, 1993 WL 196063 (1993). Here, the Board found that the "true motivation behind the termination," *see id.*, was Roemer's animus toward Haas's union activities. The Board accordingly found that Roemer's proffered justification—that termination was compelled by the company's progressive-discipline policy—was pretextual. The Board relied on Roemer's shifting explanation for Haas's termination, its inconsistent application of the progressive policy, and its tolerance of Haas's similar job-related conduct in the past. Moreover, the Board found that terminating Haas for failing to adhere to the "Theory of Constraints" methodology was not credible because Haas received no training on this philosophy and because O'Toole was perfectly willing to interrupt everyone's work time to force Haas to walk around the office and repeat for other employees that he had expressed his view that union negotiations were leading to increased stress. *See id.* at 566 (explaining that the "'fail[ure] to provide a clear, consistent and credible explanation' for discipline supports a finding of pretext" (quoting *NLRB v. Inter-Disciplinary Advantage, Inc.*, 312 F. App'x 737, 751 (6th Cir. 2008))).

Roemer contends that its earlier willingness to retain Haas even though he had previously received five-day suspensions on two occasions is not evidence of pretext because the earlier suspensions are distinguishable. Roemer points out that the suspension in 2002 was the result of a single employment violation, not a culmination of the progressive-discipline policy. Roemer also contends that Haas was not terminated following the 2003 suspension because O'Toole offered a "last chance agreement" that included certain employee concessions (less pay and a job-classification reduction).

But the Board did not find these justifications persuasive, and we grant deference to the Board's findings so long as they are supported by "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Airgas USA, LLC*, 916 F.3d at 560 (quoting *Local*

*334, Laborers Int'l of N. Am*., 481 F.3d at 878–79.  As discussed, reasonable minds could find that Roemer's previous tolerance of Haas's conduct, and its previous willingness to offer alternative forms of discipline short of discharge, suggest that the proffered justification for his termination was pretextual.  Accordingly, the Board's finding of pretext is supported by substantial evidence.

## III.

For all these reasons, we **GRANT** the General Counsel's application for enforcement and **DENY** Roemer's petition for review.